All right, Mr. Scarborough. May it please the court, Charles Scarborough, Department of Justice for the Federal Defendants. The COVID-19 pandemic has taken a devastating toll on the health and well-being of this country and the pandemic has had a particularly disruptive impact on American businesses and employers. Thus, when safe and effective vaccines became widely available last year, many employers not only encouraged their employees to be vaccinated against COVID, but required them to do so. In September of last year, President Biden... Mr. Scarborough, as I understand it, at the time of the district court proceeding, or as a matter of record, of the civilian federal employees, 98% were in compliance on the vaccination rule? I don't believe that the number was as high as 98% overall. It was somewhere in the 90s across the federal government, but... Is there anything we can take judicial notice of concerning what the percentage is now? I'm not sure what the most recent statistics are that are publicly available on that. There was something that was published, I believe, by the White House and OMB in early December that had vaccination rates across various federal agencies that's cited in our briefs, I believe. And it was on the order of 90% varying by agencies, but there are pockets within units that are lower vaccination rates. But back to the point, the president in September took the same approach basically as private employers. In acting in his capacity as CEO of the federal government, the president issued an executive order finding that to promote the health and safety of the federal workforce and the efficiency of the civil service, it is necessary to require COVID-19 vaccination for all federal employees, subject to such exceptions as required by law. Now, at least a dozen district courts have denied requests to enjoin EO 14043 on various grounds, including in cases brought by the plaintiffs here or members of the feds for medical freedom. But on January 21st, the district court here issued a nationwide preliminary injunction prohibiting enforcement or implementation of the EO. That injunction must be reversed for three reasons. First, the plaintiff's claims are barred by the Civil Service Reform Act. There's no dispute that Congress intended for employees to bring employment-related grievances exclusively through the CSRA scheme. And the plaintiffs— Can you name any decision saying a pre-enforcement facial challenge is covered by the Civil Service Reform Act? Yes, Your Honor. The AFGE decisions, AFGE decisions in the D.C. Circuit deal with exactly that situation. What was the— So they're— What was the pre-enforcement facial challenge in that? So they deal with the part of the CSRA that governs labor relations, and I want to make sure that I get the proper cites for the court. Well, it's in your brief, isn't it? It is in our briefs. Right. But I just want to make sure I'm referring to the case AFGE v. Trump, D.C. Circuit in 2019, says that the unions can't bring a pre-implementation challenge to enjoin a labor relations EO. AFGE v. Air Force is another— What was the executive order in that case? In the Air Force case, it was an executive order, or it was an order dealing with Air Force instructions for employees to wear military uniforms while performing civilian duties. And in the Trump case, the AFGE v. Trump case, it was a pretty complicated labor relations situation. But again, I think the key point on CSRA preclusion is that you can't— Nothing in the CSRA contemplates that the plaintiffs who haven't yet been injured, they haven't yet suffered an adverse employment consequence, whatever it is that would be the plaintiff court. They're the ones who actually don't have the right claims yet. I understood in district court the government claimed the claims weren't right, but you don't raise that challenge on appeal, do you? Well, we certainly don't think that—and I think the district court said this—that anybody who has a pending exception request for religious or medical reasons has a right claim. It's purely conjectural whether they will ever suffer any sort of employment-related injury. Even as the people who have disavowed raising any sort of request for a religious or medical exception to the vaccine requirement, it's not at all clear whether at the end of the day they're going to suffer any sort of discipline. That's not my question. I understood that you are not raising a right in this challenge on appeal to our court. We're not raising a right in this challenge per se with respect to the people who have disavowed exception requests. That's correct, Your Honor. We do think that that goes to the scope of the injunction, including people in the injunction who have pending exception requests. It plainly violates the limits of Article III and equitable jurisprudence as well. But yes, Your Honor, you're correct that we're not raising a rightness, a per se rightness claim or argument with respect to the jurisdiction here. We are raising a jurisdictional argument with respect to the CSRA preclusion. And again, that rightness goes to that. In other words, the people who don't yet have—the way the plaintiffs basically say that there's an exception for pre-enforcement review is that they say that you can violate a policy and then before you are actually disciplined for violating the policy, you can hop into court early and therefore avoid the CSRA preclusion that would undoubtedly apply if the government had promptly disciplined you. Because there's no question that plaintiff's standing here is premised on the discipline that they say is sure to come later on down if they violate the vaccine requirement. And if that's the basis for their standing, they can't disavow the injury that is the basis for their standing to avoid CSRA preclusion. I'm sorry. Go ahead, sir. The district court, I think, deemed that the CSRA and Elgin and all those cases dealt with there having already been an adverse employment action, if you will, an adverse action and running through cases and Fifth Circuit cases and so forth. With CSRA, it looks to be that. And I know the opposite argument, well, it gives you an end run around it, body, body. But where we are, and I'm hoping that we don't take the whole fifteen minutes on CSRA since there's so much else in here, but simply put, these D.C. Court of Appeal cases and others, they're the ones where you're relying on that cut through this, there must be or not the existing adverse action. We've got Griner and some other cases where the court clearly helped CSRA and in those cases, something had occurred to . . . There are some old cases that, there's no question, some old cases in this circuit and in the D.C. Circuit, pre-Elgin, even pre-Fausto, which was 1988, that allowed facial challenges to executive orders. That's not the world we're living in. Let me ask you one question because then I want to take us off. Okay. Not because it's not interesting, but just, you know, we could be here forever. We could. Since all this started, you know, in counsel option, I mean, there's just a whole slew of cases, you know, in all kind of courts, in our court, yada, yada, dealing with the myriad of these issues and so my question succinctly in any one of the more recent, and I got a chart here somewhere, of any of those, even in the twelve district courts that you cite, do any of them have embedded the CSRA issue as a stopping point? If so, just identify it or explain it. We'll look it up. I didn't see it looks like the denials were based on other things. You mean in the challenges to the vaccine mandate specifically? Right. Yeah. I think the closest case is the Rydie case, which is Rydie, R-Y-D-I-E, which is pending on appeal in the Fourth Circuit. The Fourth Circuit was actually going to have argument tomorrow, but the plaintiff submitted on the briefs there. But the court there, it didn't issue a definitive CSRA holding, but it said the CSRA likely precludes the claims, the very same claims that are being advanced here. So that's the closest one, for your honor. But I would just, before we leave CSRA, Elgin really does foreclose this sort of idea of an end run. The ways in which plaintiffs have tried to come into district court to say that, you know, the remedies are no good or are not sufficient in the CSRA scheme are myriad. Elgin dealt with one of the ways. Basically it was, you know, the plaintiff said, well, I'm doing a facial constitutional challenge to the military selective service requirement. Surely the MSPB can't rule on that. They can't invalidate the statute. The Supreme Court said, no, you still have to go through that scheme. And what Elgin stands for sort of at a broader proposition is that the type of claim, you can't just sort of say, well, I've got a constitutional claim and the MSPB can't give me relief, or I've got a pre-enforcement claim and I can come in because I haven't yet been, you know, had an adverse action taken against me. That type of end run is not permissible. Elgin squarely forecloses that. Before we leave it, I could just brush that off. So if we steal here, we've got time. Sure. I simply wanted for the recording of this argument, can you give us a prior example of a president invoking medical procedures on federal civilian employees? A prior example of? A president by executive order requiring federal civilian employees to undergo a medical procedure such as a vaccine. No, I can't, Your Honor. But I don't think the lack of a precedent, as the Supreme Court said, in the CMS VAX case most recently, the same exact argument was advanced there that, you know, the Secretary of Health and Human Services has never used its power over Medicare contractors to do something like this. And I would push back a little bit on the idea that compulsory vaccination is sort of an unprecedented, unheard of thing. You know, since Jacobson versus Massachusetts in 1905, compulsory vaccination under pain of criminal penalties has been allowed, it was reaffirmed in the late 40s. Well, that case involved a state legislature, didn't it? I understand, Your Honor. It involved states. You see a distinction, don't you, between a president ordering something and the Congress passing a statute? I do see a distinction, Your Honor, but I see a further distinction in the president acting in his proprietary capacity as the CEO of the federal workforce versus the president acting in his regulatory capacity. And I think that's where much of the disconnect is. Are we talking about conduct under 5 U.S.C. 7301? Yes. We're talking about the general regulation of conduct, both on-duty and off-duty conduct. We're talking about things like what President Reagan did with respect to the, you know, drug testing executive order issued then, what President Bush did with respect to the financial obligations. These are both on-duty and off-duty conduct. Neither required a change in status where you get a vaccination that's irrevocable. So the status versus conduct distinction, as we said in our brief, we think is a little bit illusory. You could sort of recharacterize any regulation of conduct as, you know, a regulation of status in the sense you could say that, you know, I'm prohibiting illegal drug use both on and off-duty. You could say I'm prohibiting drug users. You can sort of use semantic terms for those things. We think this is something that's well within the president's authority to do. Do you mean drug use as conduct or status? Drug use as conduct, I think, yes. And my point is that this is not something that's outside the mainstream. The main limiting principle, if you will, to the president's authority here or one of the main limiting principles, there's a number of them. One is political accountability, which Judge Higginson emphasized in his, you know, dissent from the order that transferred the emergency stay motion to this court. Another is the market constraints. The president, when acting in his proprietary capacity, is acting as an employer competing with other employers. And he can't impose things that are crazy and outlandish and far-fetched, like some of the examples that the plaintiffs have offered up here, because you'll lose employees. The federal workforce has a hard enough time competing with private employers on things like pay. We don't need to be doing things that will further handicap ourselves. And that is a significant limiting principle. And what is going on in this country, what was going on at the time the president issued this EO, it was a pretty mainstream thing. Private employers recognized that this was really important for the efficiency of their own employment. And the president made the same connection, the same obvious nexus to the workplace, that you use the most effective tool available in your toolbox to prevent the spread of COVID in the workplace. And that's the direct connection to efficiency in the federal workplace. So we think it falls squarely within 7301, which Your Honor mentioned, and a number of other statutory provisions. But I would like to mention that sort of the inquiry that the court is engaged in here is not to find an express delegation of power from Congress to the president. That's not necessary here in the same way it would be if we were talking about a federal agency regulating. The president has this backdrop authority. Under Article II, just as inherent as an employer, the Supreme Court recognized that in Nassif v. Nelson when it said that the president has a much freer hand in dealing with the conduct of its own employees. There are numerous other cases cited in our brief. Crandon in the Supreme Court, the late Justice Scalia, recognized the discretion-laden power under 7301, the old Dominion Post Office case. It's helpful to remember that we're here on a preliminary injunction. And of course we go through the four-pronged test, I guess Parts 3 and 4 conflated. But we're here not on whether they went on the merits, it's simply whether they have a likelihood of succeeding on the merits. So there's no absolute answer here required. That's correct, Your Honor, but on a preliminary injunction, they actually bear the burden of satisfying all of them. Of course they do. Let me stop you here. Mr. Clerk, give counsel an additional five minutes because we hung him up on CSRA for a long time and the other side will have an equal amount. We're not rushing to get through this. We're not going to take all day, but everybody's going to get their shot at covering the ground here. All right, go ahead. Thank you, Your Honor. I apologize for going on. No worries. Go ahead. You're right, Judge Parkstale. Absolutely they have to make a showing as to all four of the factors, but that's their burden on this. And so the merits is one. A substantial likelihood of success on the merits is one. And so I'm answering the authority question. Do we think we actually win on the merits? We don't have to show that, that we win, but we have to, you know. And as to the equities, we think it's pretty clearly in our favor as well. First on irreparable injury, it's really black letter employment law that employment-related injuries are not irreparable. They are reparable. They're especially reparable. There's numerous cases in this court. Garcia. Let me ask you about that. Since all these cases have filed, you know, there's been a lot of decisions handled down, you well know, in our court, BST. Last week the Navy Steels won, and there's just a bunch of them. Obviously dealing with different aspects, but still the vaccine, still the mandate, same factors, et cetera. So irreparable harm has been ginned up either directly or otherwise. So I guess my question is where are we on, what's the date, March 8th? Where are we on March the 8th, you know, not writing, I guess, completely on a blank slate, but to some degree these issues have been ginned up in decisions by our own court and so forth. So I guess my question is your argument is somewhat different or cabined in or whatever based on, you know, what our court has already said in some of these about irreparable harm and injury. Sure. Well, I mean your court has said, especially in the federal employee context in the Garcia case, has said that the availability of reinstatement and back pay remedies under the CSRA precludes your employment-related injury from being irreparable harm. In the Morgan case from 1975, you know, the court overruled a preliminary injunction that was granted where a person was going to lose their job. And the idea was that, no, you haven't shown irreparable harm, even though the harm is very serious. Obviously, employment-related harm can be very, very serious, but you don't get to come in and challenge in advance. And as to, like, the recent decisions in this court, the Sombrano, the United Airlines case that came out recently, you have our 28-J letter. The one thing that the dissent in the majority agreed on in that case was that it was not worthy to be published, and so we don't think that stands for very much. The BST Holdings decision, again, as Your Honour pointed out, involved a very different situation, a suit against OSHA brought not only by employees, but by states and employers, where I think the possibility of getting a recompense at the end of the day was sort of a little bit more remote. So we don't think any of those cases could plausibly overrule the more direct controlling lines of authority that deal with the absence of irreparable harm in the federal employee context. I realise I'm running out of time, but I wanted to just briefly note that there's been no serious challenge to the harms to the government that would flow from this injunction. There are flowing from this injunction. That widespread vaccination is really the foundation for all of the plans to return to physical workspaces, which are now underway, and this preliminary injunction unsettles all of those plans. It's the most effective tool the government has in its multi-pronged effort to reduce risk in the workplace, and it's important because it makes reliance on other mitigation measures like masking, testing, all those other things that are not as effective and are actually costly and burdensome in their own way. One point that I'd like to point out in the Jason Miller Declaration, which is a record 1803, is that the calculation was made that regular testing for just 2% of the workforce would cost $11 million to $22 million each month, and if you don't have vaccination, if you remove that foundation, you have to rely on these other mitigation measures, and the president has made a reasonable determination that vaccination is the most effective tool. In the context of a preliminary injunction and a challenge to it, and especially your pending motion to stay the preliminary injunction pending ruling by this court, what, if any, judicial notice do we take of the lessening of COVID illnesses, the mask mandates being dropped, etc., etc.? Do we give any consideration of that? I don't think you do, Your Honor, and what I was trying to indicate was that now that those things are moving in the right direction, everyone wants things to get back to normal, whatever the new normal is going to be, the federal government is actually moving away from a maximum telework posture now, and vaccination has become more important than ever for that effort because people are going to be coming back from where they've been working from home for the last 2 years. They're going to be coming back into the workplace, and that's really important that you come back into the workplace maximally vaxxed. I don't see the argument that if COVID rates have fallen greatly and masks aren't required, etc., etc., the counterargument is, well, they're safe to come back to work. I see that a counterargument can be made, but I think then ultimately it's a question of who decides, and is that going to be a district court in Texas without any of the public health expertise, any of the on-ground sort of knowledge about what's actually going on in the federal workforce, or the president acting in his capacity as the CEO of the federal workforce and his designees dealing with situations on the ground? One final point, and I promise I'll sit down, is that it's important to remember this is a process, it's a big process, there are lots of challenges, but it's been cut off at the knees. The process involves exceptions for religious and medical reasons that can be individualized, can be tailored to specific circumstances in specific units. The injunction broadly says, nope, stops it all, and that's not a tenable state of affairs for the federal government managing its own employees performing Article 2 functions. And with that, I'll reserve the remainder, whatever you choose to give me at the end. All right, Mr. Garber, we'll let you keep your full five minutes. Thank you, Your Honor. In fact, you may need it. All right, Counsel, Mr. McConner, is that how you pronounce it? Yes, Your Honor. All right. May it please the Court, Trent McConner on behalf of Appalese. Judge Barksdale, you had two questions about the record that I wanted to address quickly. You asked about the compliance rate. I would respectfully direct you to page 61 of my Fifth Circuit merits brief. We cite a White House press briefing citing 98% compliance, and just coincidentally that was the exact same day of Judge Brown's order, Your Honor. Do you have any more recent statistic for which we could take judicial notice? I'm not aware of any, Your Honor. I apologize. And Your Honor asked a second question about the record about mandates being dropped. I don't think, Your Honor, needs to take judicial notice because the government's reply brief at page 15 says the government's foregoing the workplace hazard harm as a basis for the executive order. So they're foregoing the argument that employees will be injured as they come back to the workplace. That's page 15 of their reply brief again, Your Honor. Let me ask you two threshold questions. Number one, within the plaintiffs, does the plaintiff group consist of people who have pending exemption requests also, either religious or medical, and the plaintiff's here, or are they independent of people who have in the pipeline exemptions being considered, et cetera? Do you understand my question? I think so, Your Honor. Almost all of the named plaintiffs have no pending exemption request of any kind. There may be one or two, I believe. In terms of members of Feds for Medical Freedom, more of those members have pending exemption requests, Your Honor. Judge Brown did address this point in footnote 4 of his order where he says that even for individuals with pending exemption requests, there's at least a dispute among the parties about whether they face harm, and I think that's a reference to the affidavit that I submitted from George O'Sullivan, who's just an exemplar, but he's a CIA employee, whose exemption request was granted, Your Honor, but he was told either had to take a massive demotion, go on leave without pay, or suffer the consequences, and so I think that's what Judge Brown is referencing there, Your Honor. Well, at the bottom, you know, and then you'll get to the other points, but how in the world is a nationwide injunction, you know, warranted or justifiable? Judge Brown didn't say very much about that, it was just one statement, because they're plaintiffs, yada, yada, but I mean, anybody could come in and just say, well, the plaintiff's all over the place, therefore give me a nationwide injunction. Do you see that at the bare minimum, that any injunctive relief can only apply to the people that are in the scheme of these plaintiffs, not nationwide? A few responses, Your Honor. We did support with affidavits the fact that Feds for Medical Freedom has thousands of members, including almost 1,000 now, who've submitted support for this particular case. I mean, so what? I mean, any lawsuit, somebody can come in and just say, well, we've got members everywhere. That alone, numerosity wouldn't be a requirement, or a basis to get nationwide relief, just because you got a whole bunch of members and they're still coming in, is it?  in Louisiana v. Becerra, its recent decision, Your Honor, that nationwide injunctions can be appropriate with our practical, pragmatic considerations. I don't think it's a concern so much about, it's just a lot of work to keep track of folks. Well, but it also did narrow the scope of the injunction. Well, did it not? It did, because in that case, the plaintiffs had not submitted any evidence of numerosity or difficulty tracking individuals. And I think the real distinction here, Your Honor, is not just the numerosity, like you say, Your Honor, it's the fact that throughout the proceedings in this case, the government had kind of lost track of individuals. There were individuals who would get a notice saying they would be fired, then they said they wouldn't, then they said they would, then they said they wouldn't. Individuals with pending exemption requests who were getting letters. I know you're trying, but that still doesn't seem to me responsive to quote nationwide injunction. I mean, the mere fact that the plaintiff class is, I don't know what you're saying, but just in the scheme of it, that still doesn't satisfy me on nationwide injunction in the course of all this litigation, many others, et cetera, particularly with this court. It says very little, really, about it other than their X number of plaintiffs. So, you know, got other ground to cover, just know that, you know, at a minimum, for me, just looking at what he said, as long as it is, it's very little said, and otherwise it seems to me facially very questionable how a nationwide injunction, given this in a limited amount. See, I'm not preemitting the other issues, I've argued this before, I forgot I wanted to ask that question, but you can go back to wherever you were gonna start and work your way through. I understand, Your Honor. I appreciate that. I'd like to go to preclusion then. I know we've discussed it a little bit already. In Thunder Basin, the Supreme Court held there would be no preclusion in a situation in which compliance is sufficiently onerous and coercive penalties are sufficiently potent that a constitutionally intolerable choice is presented. And this court, in the OSHA vaccine mandate case, held that a government-imposed vaccine requirement is just such a coercive choice. It's a sort of freestanding, ongoing constitutional injury. And so just as there was no response in that case for the government to argue that the plaintiffs could simply refuse to comply and suffer the consequences, and that was an argument they made in that case, there's no answer here. And for that reason, there's no preclusion, and it's because we're challenging ongoing coercion, not adverse actions, Your Honor. And I think, in fact— Ongoing—I'm sorry. I couldn't hear your word after ongoing what? Sorry. Ongoing coercion, unlawful coercion, Your Honor, which is the same point this court recognized in OSHA when it discussed the threat to liberty interests. And I think— It's still a workplace issue, and in many, a whole bunch of these, you know, cases, people are bringing actions, you know, about the workplace environment, you know, from discrimination in the plain sense to retaliation to this to that, whatever, whatever. And so the underlying basis is to say, look, rather than having a hodgepodge of remedies or bases for people to seek relief, here's CSRA, do that, come back, come around, then you get in court. So I get the big couched maybe some provocative wording, but it's still workplace and so forth, so what happens with the congressional scheme to channel those complaints in that administrative arena? Is it just a matter of how you couch what you say is happening to you that you get to do that? Isn't that an overriding congressional statement of purpose? Well, so in the vast majority of cases, Your Honor, and this is borne out, I believe, in the government's case citations, there is a past obviously covered adverse action under the CSRA. Elgin itself was like that. The plaintiff in that case had admitted he'd been fired, admitted that was a CSRA covered action. That accounts for almost every one of the government's cases, Your Honor. Those individuals, once they're in that CSRA scheme, that's where they will remain, and they can't try to get clever with an APA claim or something else. That's what the government's cases are saying, Your Honor. The cases like Elgin, they didn't resolve the pre-enforcement challenges. They didn't resolve folks who haven't been disciplined or haven't suffered one of those CSRA actions, and you don't have to take my word that Elgin doesn't really address those cases. The government's own Supreme Court brief in Elgin at pages 17 to 18 said there will be actions that arise out of the employment relationship with federal employees that are not going to be covered by the CSRA, and the government said those sorts of claims can go through a different route, and they suggested the APA, for example. And so for these kinds of claims where there's not yet an adverse action, and I think one of the key distinctions here is that for most individuals, Your Honor, there probably will never be an adverse action. That's the effect of the mandate. Maybe it's the point of the mandate. They won't actually reach the point where they are terminated and could bring it, or at least most people will not. For those individuals, it does not interfere with the CSRA scheme to have them bring a pre-enforcement challenge that courts have entertained for nearly 40 years, Your Honor. And I think actually Judge Costa's dissent in the recent Cochran-Ombank case, at footnote 15, he addresses this point. That's obviously in the context of the SEC, not the CSRA, and he says it may seem anomalous at first that someone who isn't yet subject to these ongoing proceedings could bring a suit, but yet someone, once they are subject, could not, which was his view. And he says, but actually it makes sense under the statutory scheme because once the person is within the administrative process, in our case, I'd say, once the person has had an adverse action covered by the CSRA, that's where Congress's intent picks up. It wants to funnel all of those cases to an administrative scheme. But before then, Congress hasn't spoken on that. And so there's no concern about interfering with Congress's power for individuals before that situation, Your Honor. If I could, I'd like to speak a little bit about the merits as well. The Supreme Court said in the recent OSHA vaccine case the two most important factors for a claim of executive power are historical precedent and the breadth of the government's power, requested power, I should say. And here, as the government's counsel acknowledges, there's no prior historical precedent of the president ordering any kind of medical procedure for any federal employees, let alone every federal line level employee. The closest they have, I'd say, would be perhaps President Reagan's drug testing order. I think the briefing covers that one at length, Your Honor. The biggest distinction, in my mind, is that 5 U.S. Code 7513, which is the CSRA, gives the executive branch the power to immediately discipline employees who there's reasonable suspicion to believe have committed a crime that would be imprisonable. And at least in the 1980s, I think almost all drug use in the workplace or outside of the workplace would have been an imprisonable crime. And so essentially what that executive order says is follow the law. And most of the examples the government cites are follow the law executive orders. But there's no law here that requires a vaccine. It's not illegal to say no to a vaccine. And so those examples the government has historically, we believe, are not sufficient to support the claimed authority here. In terms of the second factor, the Supreme Court pointed to the breadth of the power claimed. 7301, which speaks to conduct. And we, of course, say that requiring people to be vaccinated is a status, not conduct. There's support for that, I would mention. 60 years ago, for example, in Robinson v. California, the Supreme Court said there's a distinction between status and conduct. That's why states can criminalize drug use, but states cannot criminalize being a drug user. But setting that aside, on the breadth point, the government cites no real limitation under 7301 except that the individuals be executive branch employees. But that would mean that for executive branch employees, the president can order almost anything that he wants. The government's primary argument in response seems to be that don't worry, the president won't do anything crazy, but that's not a legitimate legal argument for interpreting a statute. The definition of conduct or employees' rights under the statutes don't depend on the president being a nice person or a reasonable person or someone who cares about the employment market. And the telling part about the government's statutory argument about breadth under 7301 is that they're hanging on kind of the thinnest of reeds, the argument that making everyone get vaccinated is conduct. But we know in society in our briefs that Congress knows how to require vaccines in the INA, 11 U.S.C., 1182, which of course deals with immigration and other area where the government would argue the president has inherent Article II power. Congress lays out very clearly certain individuals need to have these vaccines, and they can also be required to have vaccines for any new contagious diseases that come up for which a vaccine would apply. And so given that kind of clear language, the absence of which there is in the CSRA, I'd say that the government's argument about conduct and the breadth of conduct are ones that are not persuasive, as the district court found. On the Article II inherent power points, Your Honor, these employees are all line-level employees. They're no political appointees. They don't exercise high-level executive actions of any kind. The CSRA, for these individuals, covers the waterfront for what the president can do to them and how he can do it. Under the government's theory, at the very least, every affirmative grant of power to the president in the CSRA is superfluous because they would say he has all of that power anyway. They argue Congress can limit it, and they say Congress hasn't. We obviously believe the opposite, but the point is the premise of their argument under Article II largely renders the CSRA a nullity, and they do not challenge the CSRA's constitutionality, to be clear, so of course the court can take that as granted. On the particular statutes, I've discussed 7301 a little bit. The government also invokes two other statutes, 3301, 3302. I think it's noteworthy in the government's own reply brief at page 19, the government says these three statutes are, quote, narrow in scope, and I think that's something that I would agree with. They do not provide the authority that the government seeks here. 3302 is, I think, the next one that the government relies on the most, after 7301, Your Honor, has admittedly what the district court found to be a seemingly broad first sentence followed by a list of examples in the second sentence, and I would say that the court should treat that statute like the Supreme Court treated the statute in Alabama Association of Realtors. That's the CDC eviction case where there was likewise a very broad first sentence followed by examples, and the court says we have to read it all together. We have to read the rules in this case under 3302 to be like the examples given. The examples given in the last half of 3302 are all very narrow authorities. On the government's power, if the court were to find these statutes ambiguous, we do argue the court should apply one of the clear statement doctrines. I think the one that's most applicable would be the so-called federalism clear statement doctrine that this court used in the OSHA vaccine mandate case where this court said that requiring someone to be vaccinated is a very prototypical state police power, and the Sixth Circuit's decision in Kentucky, this is cited in my briefing, addressing the contractor mandate explains why that federalism clear statement doctrine applies even to individuals with a federal nexus. In that case, it was federal contractors. Here it was federal employees, and the point is that the government is requiring a very large group of people to undertake something that the state has always had power over, and because the government doesn't make any distinctions, it's not tied to anything particular about the federal workplace. In fact, as I said, the government's brief seems to disclaim that. What we really have is a general health regulation. It's not regulating federal employees as federal employees. There's also, of course, the major questions doctrine, which the Supreme Court applied in the OSHA vaccine mandate case. The government cites to the other case the Supreme Court considered simultaneously, the CMS mandate case, and in that case, the Supreme Court held that there was clear statutory power for that mandate. The statute at issue, I believe, said that HHS had authority to require anything necessary for the health and safety of individuals who worked at these hospitals. But, of course, in 7301, there's nothing about health and safety, let alone a vaccine mandate. Nothing like that in 3302. And so as we see it, there's two competing interpretations of these statutory powers. The first is one like the district court found, cabin to the workplace, or another way to think would be cabin to aspects that arise because of a unique relationship with the federal government, a unique aspect of their employment, I should say, kind of like the ethics examples the government gives. That's on one hand, as the district court found and as we argue. On the other hand, you have the government's view, which is as long as the president can label something as conduct, and they admit that they think that's a very broad concept, then the president can order it for all federal employees, for every federal employee at any time. And they argue that some of the examples in our briefs are far-fetched, but I don't think that they're necessarily so far-fetched. I imagine probably a few years ago it would have seemed far-fetched that a president would have ordered every civilian employee to get vaccinated or face termination. And so some of the examples we give are ones that, under their theory, the president would have that power, and they haven't really provided a limitation or an explanation for why the president wouldn't, except that they just think the president wasn't as kind of a political matter. The government did briefly mention the scope of the injunction, which I know we've already talked about. I want to go back to that point, Your Honor, since I know you're interested in that, Judge Stewart. And as I said, it's not just the numerosity that's at issue here. It's the practicality of trying to track everyone. And I think the district court's point was that unless he makes this a broad, clear injunction, then individuals entitled to relief are going to fall through the cracks. And so the only way that he can determine kind of ex ante to ensure that that doesn't happen is to issue a broad injunction that even these government agencies can follow. And I think that's his theory there. And that pragmatic concern is one, as I said, that Louisiana v. Becerra said is a supportable explanation, Your Honor. And so we would argue that the district court, at the very least, did not abuse its discretion in granting that kind of broad relief. I see my time has expired. Unless the court has other questions, we would ask the court to affirm the P.I., deny the government's motion. All right. Thank you, Mr. McConnell. Thank you. All right. Back to you, Mr. Scarborough or Bell. There's a lot there, so I'm going to try to be brief on each of these topics. First, on CSRA preclusion. Plaintiff's view would basically have you believe that if there were plaintiffs in Elgin, in addition to the ones who had actually suffered an adverse employment action, there was an additional plaintiff there who had not actually been disciplined for violating the selective service requirement. That plaintiff would have been able to go into district court, and the other guys would have been relegated to the CSRA scheme. I think that shows sort of the absurdity of the position they're advocating. They're saying, basically, that the plaintiffs who haven't actually suffered but whose standing is nevertheless predicated upon unemployment-related injury that they say is certain to come, somehow, because they have the temerity to come in early, get to go to district court and avoid the CSRA scheme. That's not what Elgin would countenance, what many, many CSRA cases in this court would countenance. What's your quick response to the citation from the government's brief in Elgin?  I think I would need to go back and look at the... I mean, we're happy to submit something to the court and find out. On the authority point, I really need to return to the fundamental point here that permeates the whole analysis. You know, when you talk about cases about the government exercising regulatory authority, the Supreme Court has indeed said things about how you need to look closely at the congressional delegation of authority here, closely at the statutes that give the authority. This is the president exercising his authority as an employer under Article II pre-existing authority. The statute, we don't quarrel with the CSRA. Plaintiffs are right about that. We don't quarrel with the anti-discrimination statutes that apply to the federal government. There are lots of ways in which the president and federal government employers' discretion to deal with their employees are cabined. The discrimination principles, the basic principle that it has to advance the efficiency of the civil service, all of those things are embedded, and they provide boundaries to the president's exercise of his authority. And they provide limiting principles that sort of take out of play some of the more far-fetched examples. And as we pointed out, so those are statutory boundaries there. And we pointed out there are additional boundaries that make the concerns here less worrisome. And again, the sorts of arguments that, you know, there are no limiting principles, ultimately that itself is a limited argument. It ultimately doesn't tell you whether something that is within the authority, just because you can't figure out the outer bounds, doesn't tell you whether something is within the authority. Finally, with respect to the balance of equities, we talked a little bit about irreparable injury. It's just black-letter employment law, again, especially with federal employees, that you get compensatory remedies at the end, and that precludes any sort of claim of irreparable harm. There's no serious dispute about the harms to the government. They're laid out in the Jason Miller Declaration. And as to the public interest, I can't say it any better than Judge Higginson did, so I'm just going to quote him. The public interest is not served by a single Article III district judge lacking public health expertise and made unaccountable through life tenure, telling the president of the United States, in his capacity as CEO of the federal workforce, that he cannot take the same life-saving workplace safety measures as private sector CEOs. And finally, just on the point about more narrow tailoring, effectively this injunction granted plaintiffs relief as if they had a certified class action, without actually having to go through, you know, bother with the requirements of Rule 23, which would at a minimum have excluded the people who had pending exception requests, you know, who didn't have right claims. They didn't go through any of that process. I don't believe you raised that in your brief, do you? Well, we raised it, I think, in the sense that, you know, what the injunction does is give them the ability through the, you know, additional people coming into, joining their association, basically gives a sort of a one-way ratchet in terms of that you join our association because we've got an injunction. And that's not, that's a rule against one-way intervention. It's pretty well established. We did cite that. The American Pipe case in the Supreme Court stands for that proposition. And so, finally, I do want to come back to the point that Judge Higginson again raised, is this goes, you know, basically down to a question of who decides. And the president is the singularly most accountable elected official in the country. And he's not making a decision as to other employers, in this case. He's making a decision as to his own workforce, the people that help him carry out his Article II responsibilities. And at that narrow respect, this, you know, this exercise of authority, you know, the vaccine mandate is a response to an unprecedented situation in this country. So we can't provide a situation where the president has acted in this way. But that, nevertheless, doesn't mean that it's not a lawful exercise of authority. The final point, and I swear I will sit down, is that we've had an emergency motion for a stay pending in this court. Counsel, you don't need to swear that you'll sit down. You're supposed to sit down when your time stops. Okay. May I? That's up to Judge Stewart. Great attention. We would just encourage the court to rule on our emergency stay motion, which was carried to this panel. Thank you, Your Honor. Thank you, Mr. Carver. Thank you, Mr. Conner, counsel, for the briefing and robust argument in the case. This concludes the third case for argument on today. And with that, the panel will stand in recess until 9 a.m. in the morning. Counsel and the party are free to leave the courtroom. You may leave. I'm going to be a little slow.